**In re James Yao GLEASMAN, Margaret Yao Gleasman, Debtors.**

**James Yao GLEASMAN, Margaret Yao Gleasman, Plaintiffs,**

**v.**

**JONES, DAY, REAVIS & POGUE and Franklin Federal Bancorp, Intervenors.**

**Bankruptcy No. 88–12906–LMC.
Adv. Nos. 88–1294, 88–1295.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

Jan. 3, 1990.

Stephen A. Roberts, Austin, Tex., for debtors and plaintiffs.

J. Steven Ravel, Milgrim, Thomajan and Lee, Austin, Tex., for Franklin Federal Bancorp.

## ORDER GRANTING STAY
## PENDING APPEAL

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the motion of Plaintiffs James Yao Gleasman and Margaret Yao Gleasman (the "Gleasmans") for Stay Pending Appeal, and the response and objection thereto of Defendant Franklin Federal Bancorp ("Franklin"). The court finds and concludes that a stay should be granted upon conditions as set forth herein.

### I. *Facts and Procedural History*

The tortuous procedural history of this case begins in state court where the Gleasmans' commenced a lawsuit against Franklin's predecessor in interest, Franklin Savings Association. The suit sought damages for usury and various theories of lender liability. It also sought injunctive relief (both temporary and permanent) to prevent Franklin from enforcing its mortgage against the centerpiece of this litigation, a 151–acre tract of land just west of Austin, Texas, until the litigation was resolved. The Gleasmans fared poorly this time around, and perfected an appeal. While the appeal was pending, the Gleasmans initiated a second state court action, and again sought an injunction. That court granted the injunction, but conditioned it on the Gleasmans posting a bond in excess of $300,000 within a matter of days. Unable to post the bond within the short time frame specified by the state court judge, the Gleasmans filed bankruptcy, invoking the "free injunction" of the automatic stay. A few days later Franklin Savings underwent its own form of insolvency proceeding as the Federal Home Loan Bank Board closed Franklin Savings, selling its assets under the so-called "Southwest Plan" to Franklin Federal Bancorp.

Not long after the bankruptcy filing, the Gleasmans removed both state court law suits to federal court. Franklin then intervened in the adversary proceedings. The two adversaries were subsequently consolidated, as they both comprised essentially the same cause of action. The Federal Savings & Loan Insurance Corporation (FSLIC), which had a brief (but important) association with the property as a result of the Southwest Plan transaction, was dismissed out of the lawsuit by agreement of all the parties.[1] After considerable discovery, this court entered summary judgment in favor of all remaining defendants[2] and against the plaintiffs. The Gleasmans timely filed an appeal from this adverse ruling. Shortly thereafter, Franklin obtained relief from the automatic stay in the main bankruptcy case, removing the statutory injunction that had, until then, prevented Franklin from foreclosing on the 151–acre ranch.[3] The Gleasmans, for the first time bereft of the automatic stay, now seek a stay pending their appeal from the summary judgment to prevent Franklin from foreclosing on the subject matter of the case, the 151–acre tract of property which secures what the Gleasmans continue to maintain is a usurious and so non-enforceable note.

## II. *Introduction*

This case requires at the outset that we settle on the appropriate standard for deciding whether a stay should issue. The Gleasmans argue that they are entitled to a stay as of right upon the posting of a supersedeas bond pursuant to Federal Rule of Civil Procedure 62, as incorporated in Bankruptcy Rule 7062. They ask that this court only set the amount of the supersedeas bond, taking into account only Franklin's actual holding cost with respect to this property. Franklin counters that the Gleasmans should not get a stay unless they can pass muster under the test set out in *Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981) (setting out the federal standard for a stay of an adverse ruling on the entry of injunctive relief under Rule 62(b) of the Federal Rules of Civil Procedure). Franklin maintains that a stay as of right is inapplicable in this case, pointing out that there is no "judgment" to supersede here. It adds that, even if a supersedeas were apropos, the supersedeas bond should be set in the amount of Franklin's *entire* claim—$5.2 million—not just in the amount of the value of the property sought to be insulated from foreclosure.[4] Franklin finally asserts that, at the very least, the amount of the bond pending appeal should equal the value of the property plus carrying costs. The Gleasmans retort that Franklin, because of its participation in the Southwest Plan, is already indemnified against any loss of the collateral and carry-

---

**1.** The Plaintiffs conceded that the *D'Oench Duhme* doctrine would doubtlessly insulate the FSLIC from any liability on the cause of action which is the substance of this litigation. *See D'Oench Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

**2.** The law firm of Jones, Day, Reavis & Pogue was also a named Defendant in the lawsuits and benefited from the summary judgment entered by this court. Jones, Day is not involved in this action for stay pending appeal.

**3.** The Gleasmans had been relieved of the affirmative obligation of obtaining a temporary injunction during the pendency of the litigation for so long as the automatic stay of the bankruptcy case was in place. Had the bankruptcy proceeding not been initiated, of course, they would have had to have put up the bond imposed by the Travis County District Court as a precondition to the maintenance of an injunction during the pendency of the litigation.

**4.** We find without further discussion that this last contention is clearly unfounded because the ruling from which this appeal is taken does not give Franklin an affirmative judgment. It merely eliminates defenses to Franklin's claims. While Franklin is *owed* $5.2 million it holds a *secured* claim only to the extent of the value of its collateral. 11 U.S.C. § 506(a). Only the secured claim is at risk during this appeal. The unsecured deficiency is unaffected by this appeal (the continuing bankruptcy prevents further enforcement of unsecured claims regardless of the future of this adversary proceeding). Franklin's secured claim is no greater than the value of the property, currently stipulated to be worth no more than 1.5 million dollars. It is the value of the collateral securing that claim which any bond should protect. Franklin invites this court to, in effect, turn the deficiency portion of its claim into a secured claim (i.e., secured by the bond). There is no merit to conferring such a windfall on Franklin.

ing costs and thus does not require the added protection of a bond.

### III. *Bankruptcy Rule 7062 and Stay as of Right*

█ Rule 62(d) of the Federal Rules of Civil Procedure (incorporated into Bankruptcy Rule 7062) provides that, subject to enumerated exceptions, an appellant may obtain a stay of an adverse judgment pending appeal by posting a supersedeas bond in the amount of that judgment. Fed.R. Civ.P. 62(d). The so-called supersedeas stay, under which a court's role is delimited to passing on the amount of the bond, typically operates only to stay the execution of a money judgment, or a judgment determining an interest in property. *In re Swift Aire Lines*, 21 B.R. 12, 14 (Bankr. 9th Cir.1982). Because this summary judgment against the plaintiffs resulted only in a "take-nothing" judgment, there is nothing here to supersede, so there is no stay as of right.[5] Rule 62(d) and the associated supersedeas analysis is thus not apposite here.

### IV. *Bankruptcy Rule 8005 and the Appropriate Standard*

█ Bankruptcy Rule 8005 provides a standard more suited to the bankruptcy setting. The nature of bankruptcy proceedings is such that supersedeas stays are seldom applicable,[6] as most bankruptcy court rulings adjust the relative rights of parties to property.[7] When a party desires a stay of such rulings, a principle concern in a bankruptcy case will be the effect of such a stay on the administration of the balance of the case. Bankruptcy Rule 8005 is by its design a flexible tool which permits a bankruptcy court to uniquely tailor relief to the circumstances of the case, so that the appellate process will neither undo nor overwhelm the administration of the bankruptcy case. *See, e.g., In re Charles & Lillian Brown's Hotel, Inc.*, 93 B.R. 49 (Bankr.S.D.N.Y.1988). Rule 8005 gives a bankruptcy judge authority to "make any . . . appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest." The bankruptcy judge can design stays to avoid unjust results, taking into consideration all the exigencies of the entire bankruptcy case. *See In re Tenfield*, 12 B.R. 14 (Bankr.E.D.Va.1981). Discretion is not unbridled, of course, but the scope of appellate review of stay orders issued under this rule is limited to clear abuse of discretion. *In re Rhoten*, 31 B.R. 572 (M.D.Tenn.1982).

█ Because of its built-in flexibility, the rule offers little guidance for what might constitute an abuse of discretion. Many bankruptcy courts looking for direction have employed a test comparable to the one laid out in *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir.1981).[8] *See, e.g., In re Smoldt*, 68 B.R. 533 (Bankr.N.D.Iowa 1986); *In re Kerzman*, 63 B.R. 393 (Bankr.D.N.D.1986). The *Ruiz* test is not appropriate, however, for stays of most rulings in bankruptcy, for it is intended to apply specifically to orders on injunction applications. Most bankruptcy rulings are not, by their nature, injunc-

---

5. It is a *non sequitur* to speak of "staying" a take-nothing judgment. What the Gleasmans in truth desire is an order which will continue the benefits of the automatic stay during this appeal with regard to the 151–acre ranch. It is not the take-nothing judgment which itself imperils that property but the loss of the automatic stay in the main bankruptcy case. A supersedeas only operates as a "substitute" for the recovery a successful *plaintiff* might otherwise enjoy as the result of an enforceable judgment in a *plaintiff's* favor.

6. A money judgment associated with a nondischargeability complaint is one common applicable example. The judgment entered in a related proceeding initiated by the debtor to collect on a third party claim is another.

7. Consider, by way of example, orders on claims to exemptions, approving assumption of executory contracts, permitting post-petition financing, allowing and disallowing claims against the estate, classifying claims, and authorizing sales of assets.

8. The test is a familiar one. The factors used to determine whether a stay of an injunction pending appeal is warranted are 1) whether the movant has made a showing of likelihood of success on the merits, 2) whether the movant has made a showing of irreparable injury if the stay is not granted, 3) whether the granting of the stay would substantially harm the other parties, and 4) whether the granting of the stay would serve the public interest. *Ruiz*, 650 F.2d at 565.

tive.[9] Slavish adherence to the *Ruiz* test for stays of all bankruptcy orders would impermissibly shackle the bankruptcy judge and so undermine the intended flexibility of Bankruptcy Rule 8005. *But see In re Richmond Metal Finishers*, 36 B.R. 270 (Bankr.E.D.Va.1984) (holding that a stay pending appeal in a bankruptcy action is in the nature of a preliminary injunction). The court's discretion under Bankruptcy Rule 8005 must be substantially broader than that afforded a court by Rule 62 of the Federal Rules of Civil Procedure.

■ Of course, when the nature of the ruling *is* essentially injunctive, the *Ruiz* test is entirely appropriate. Even in such cases, however, its use is not *mandated*, for in select circumstances, the bankruptcy judge will need the flexibility of Bankruptcy Rule 8005 to fashion appropriate relief to fit the needs of the particular case, even though an injunctive ruling is at issue. It is probably safe to say that reliance on *Ruiz* under such circumstances would not be an abuse of discretion, but that failure to follow that standard does not necessarily mean that the court has abused its discretion.

### V. *Applying Bankruptcy Rule 8005*

■ In the instant case, no injunction was in place when the court entered its summary judgment, other than the automatic stay associated with the bankruptcy case itself. A preliminary injunction had been issued in the state court proceeding prior to the removal of the action to federal court, conditioned only on the posting of a bond. The bankruptcy filing obviated any further need to pursue this injunction in the adversary proceeding. Franklin has thus been precluded from foreclosing on the subject property notwithstanding the pendency of the litigation, not by an injunction but by the automatic stay. Although the automatic stay has since been lifted, that did not happen until *after* the summary judgment was entered. As of now then,

the case stands in the same functional posture as it would have had there been a preliminary injunction in place prior to judgment, and the appellant were seeking a stay pending appeal from that judgment.

Franklin quickly argues that the court has already ruled on the merits of the Gleasmans' entitlement to further injunctive protection by lifting the automatic stay. That contention is not entirely accurate, however. The Gleasmans' lawsuit against Franklin seeks to invalidate Franklin's claim, operating as the functional equivalent of an affirmative defense to Franklin's claim in bankruptcy. The summary judgment cleared away the affirmative defense, eliminating one barrier to Franklin's foreclosure on the ranch. While it is true that the automatic stay was lifted shortly after the summary judgment, removing the "injunctive" impediment to that enforcement, the only occasion on which the Debtors actually interposed the merits of their claims against Franklin's right to foreclosure (i.e., at the state court injunction hearing), the Gleasmans prevailed and an injunction issued. Affirmative defenses to claims, such as that which convinced the state court to issue an injunction in the lawsuit, could not be raised to rebut the motion for relief from stay. *D–1 Enterprises, Inc. v. Commercial State Bank*, 864 F.2d 36 (5th Cir.1989). The lift stay ruling thus does not operate as an estoppel to seeking a stay pending appeal because the gravamen of the cause of action was neither actually nor necessarily litigated there. *In re Lewisville Properties, Inc.*, 849 F.2d 946 (5th Cir.1988).

### VI. *Equitable Concerns and the Test for Preliminary Injunction*

■ For purposes of determining whether a stay pending appeal should now issue, we are analytically in the same posture as an appeal from the termination or denial of an injunction. The Gleasmans' motion for stay pending appeal is thus most appropriately analyzed as a request for continuation of that injunctive relief. That analy-

---

**9.** Consider, by way of example only, orders allowing or disallowing claims, orders sustaining objections to exemptions, orders confirming plans, orders authorizing assumption of exec-

utory contracts, orders determining tax liability and orders approving compensation of professionals.

sis, distilled to its essence, calls for a balancing of equities (i.e., the likelihood of success on the merits of the case, the relative harms which would be suffered by the parties as a result of granting or denying the injunction, the inadequacy of any remedy at law which would result in irreparable injury if the stay is not granted) and a consideration of public policy concerns, i.e., whether granting a stay would serve the public interest. *See Ruiz*, 650 F.2d at 565. Even though the court is not bound to follow the *Ruiz* standards, it is still free to look to the terms of *Ruiz* for guidance. With these considerations in mind, we turn to whether and on what terms a stay should issue here.

A foreclosure on real property is properly enjoined where the plaintiff's cause of action is such that, if the plaintiff were to prevail, the resulting liability would eliminate either the indebtedness or the lien, in turn eliminating the lender's right to foreclose. *See El Paso Dev. Co. v. Berryman*, 729 S.W.2d 883, 885 (Tex.App.—Corpus Christi 1987, no writ). The injunction would be warranted to prevent the subject matter of the case from being rendered moot by the foreclosure. Here, the Plaintiff claims usury on the part of the Defendant's predecessor in interest, Franklin Savings Association. All acknowledge that the "interest" rate charged was more than twice the legal rate.[10] Should the Gleasmans prevail on their usury claim, Franklin would, under Texas law, after appeal forfeit all principal as well as interest. The right to foreclose would thereby disappear because the Gleasmans would owe nothing to Franklin. Tex.Rev.Civ.Stat. Ann., art. 5069, § 1.06 (Vernon 1987). Without an injunction, Franklin would have the benefit of its lien even though it might not be entitled to that benefit. An injunc-

tion is appropriate to preserve the Gleasmans' interest in the property pending resolution of that legal issue, provided (1) money damages are inadequate to satisfy the plaintiff's claims and (2) the plaintiff has a justifiable right to pursue the legal question it raises in the appeal.

A number of Texas cases have held that the uniqueness of real estate inherently satisfies the requirement of inadequate remedy at law and irreparable injury. *See, e.g., Home Sav. of Am., F.A. v. Van Cleave Dev. Co.*, 737 S.W.2d 58 (Tex.Civ. App.—San Antonio 1987, no writ); *but see Southwestern Savings & Loan Association v. Mullaney Constr. Co.*, 771 S.W.2d 205 (Tex.App.—El Paso 1989, no writ). These plaintiffs have demonstrated to the court's satisfaction the irreplaceability of this property. If no stay is granted, the property will be lost to foreclosure. Money damages are clearly inadequate to replace the property.[11] The facts support a finding of both irreparable injury and a lack of any adequate remedy at law if the stay is not granted.

Appellants also satisfy the likelihood of success on the merits element, as applied to appeals. Untested legal questions and those on which there is a divergence of authority are ripe for appellate review. The appellants' likelihood of prevailing on the merits in this case is at least colorable. *See In re Tenfield, Inc.*, 12 B.R. 14, 15 (Bankr.E.D.Va.1981). Appellants raise a substantial issue of law untested at the circuit level, to wit, whether the protection of the *D'Oench Duhme* doctrine (the controlling legal issue which led to the summary judgment against Plaintiffs) in fact extends to protect entities which purchased failed thrift institutions under the Southwest Plan.[12] Although this court ruled as

---

**10.** The court declined to reach the usury issue in the summary judgment on grounds that the shelter principle passed to Franklin *D'Oench Duhme* protection against that claim.

**11.** The ranch is undoubtedly unique both in its wild beauty and its proximity to northwest Austin. The law has long indulged the tenet that land is not fungible, not even Texas land. *Home Sav. of Am., F.A. v. Van Cleave Dev. Co.*, 737 S.W.2d at 59.

**12.** The "Southwest Plan" was a mechanism devised by the Federal Savings & Loan Insurance Corporation to package, market, and sell failed and failing thrift institutions to buyers and investors, some of which were formed expressly to acquire these assets, with the FSLIC pledging the full faith and credit of the United States to support the transactions. While the transactions bear a familial similarity to so-called "purchase and assumption" transactions, for which

a matter of law against Plaintiffs, that same court is nonetheless reluctant to predict the outcome of the appeal. Questions of law are always subject to *de novo* review on appeal. It would be highly inappropriate for this court to abbreviate the parties' practical ability to test this important legal question by denying a stay that would maintain the status quo during its pendency.

The public interest is also best served by a stay of the foreclosure pending appeal, provided the public fisc is adequately insulated from loss. If indeed the plaintiffs are right in their contention that the Southwest Plan transactions are not protected under the *D'Oench Duhme* doctrine, then it would be inequitable in the extreme to permit the defendant to have the *de facto* benefit of that protection by having been able to foreclose on the property. By staying any action until this issue can be resolved, an important legal issue with ramifications running far beyond this particular case can be answered, giving guidance to the government agencies charged with the responsibility for these financial institutions, along with the many debtors who must deal with these agencies in order to work out their financial difficulties. Indeed, the public has a great interest in the difficult and unanswered legal questions raised by the massive failure of the thrift industry in Texas. Granting a stay here will contribute to that resolution.[13] However, the risk of diminution in the value of the collateral as a result of the stay, and the holding costs associated with the delay, should not be visited on the public fisc,

which has been implicated by the somewhat gratuitous pledge of the full faith and credit of the United States by the FSLIC in the Southwest Plan transaction.[14] We discuss below in some greater detail the appropriate parameters of a bond to insulate the public fisc.

## VII. The Appropriate Standard for "Bond" on Appeal

There is in general a strong policy against granting stays without providing some security to the adverse party. *In re Calisoff,* 92 B.R. 357 (Bankr.N.D.Ill. 1988). The form, the amount and the sufficiency of that security are generally matters within the discretion of and for determination by the bankruptcy court. *In re Max Sugarman Funeral Home, Inc.,* 94 B.R. 16, 17 (Bankr.D.R.I.1988). The appellants argue that, because a bond is designed primarily to mitigate harm otherwise visited on the appellee by the appellate process, little or no bond should be required here, arguing that Franklin will suffer little or no harm during this appeal process because it is already indemnified against any risk of loss resulting from delay in enforcing its lien by an assistance agreement running in favor of Franklin from FSLIC.[15]

The argument contravenes significant public policy concerns which militate against imposing the cost of this litigation on third parties involuntarily and indirectly dragged into the fray. In the instant case, the third party in question is the United States, and the ultimate obligors, the United States taxpayers.[16] Balancing the rela-

---

*D'Oench Duhme* protection is unquestionably available, they also differ in important respects, the most significant of which is their lack of express statutory authorization. *See* 12 U.S.C.S. § 1729 (Law. Co-op. 1978 & Supp.1989); *compare In re Instrument Sales & Service, Inc.,* 99 B.R. 742 (Bankr.W.D.Tex.1987) (describing an FDIC–sponsored purchase and assumption transaction). The Southwest Plan is currently the subject of inquiry by the House Banking Committee of the U.S. House of Representatives.

13. Under the same rationale, Appellant's request for injunctive relief to stay Franklin's obtaining a valuation of the property under 11 U.S.C. § 506 is denied. Such a valuation hearing is

neither precluded by the valuation of the property reached in this hearing, nor would it prejudice either the prosecution of the appeal or the bankruptcy case-in-chief.

14. A pledge which can only be undone by Congress.

15. The assistance agreement itself is under court seal. The issue at hand can be disposed of without any specific reference to the document. It is enough to say that there are assistance provisions.

16. Congress recently enacted legislation to "bail out" the FSLIC, committing over $155 billion toward, *inter alia,* meeting the obligations in-

tive equities of imposing the cost of pursuing the appeal on the Plaintiffs, who first signed on to the indebtedness voluntarily, versus imposing those same costs on the taxpayers of the United States, who had no voice in either the extension of credit or the FSLIC's decision to "indemnify" the ultimate purchaser of the failed institution, the choice is at once clear and compelling.[17] If the question of a bond were to turn solely on the risk of loss to the Defendant, without regard to who is picking up the tab, then appeals of this sort would proliferate at the public's expense. The cost of private litigation should not, as a matter of public policy, be financed by the public fisc.[18]

The Gleasmans are thus required to protect Franklin (and by extension, the public in general) against loss during the pendency of appeal, without regard to any assistance agreement Franklin might have with FSLIC. The question is how much, and against what loss.

At the very least, Franklin must be protected against any diminution in the value of its collateral pending appeal. *In re Pine Lake Village Apartment Co.*, 21 B.R. 395, 396 (S.D.N.Y.1982). A bond of $250,000 should be adequate to that end, as a decline in the value of the property greater than that amount is highly unlikely. The property is currently undeveloped and the appraisals of even the lender anticipate that the market will at worst remain flat for the foreseeable future, but will in all likelihood show some small appreciation over time. The Gleasmans are required, therefore, as a condition to the maintenance of a stay, to establish a bond in favor of Franklin in the amount of $250,000, cash or surety, within fifteen (15) days of the entry of this Order.

It is also necessary to require the Gleasmans to cover Franklin's interest accruing on its secured claim. The stay imposed on Franklin during the appeal period bars Franklin from selling the property, preventing Franklin from realizing on its collateral and so preventing Franklin from mitigating the running of interest. Compensation for interest will not commence to run, however, any earlier than Franklin itself could expect to sell the property to a third party, as that is the earliest Franklin could be expected to mitigate the loss of interest. Market conditions being what they are, a holding period to obtain the market value of the property can be anticipated, even if Franklin had the property to sell today. Interest should begin to be paid on Franklin's secured claim, therefore, only when Franklin's inability to resell is caused more by the stay than by market conditions. The appraisals in this case (as well as the experience of this court) suggest that a reasonable holding period for this property is about one year. Indulging the potential for earlier sale absent the stay, the court concludes that the Gleasmans should start to pay interest to Franklin beginning eight months after October 2,

curred by FSLIC in closing and re-selling thrift institutions. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (1989).

17. The calculus is, in the end, not a balancing between the relative innocence of the Plaintiffs and the culpability of the lender, as the Plaintiff contends. Regardless of what sins either Franklin or its predecessor might be guilty, it is entirely the innocent taxpayer who faces the ultimate risk of loss, unless the plaintiffs themselves are called upon to bond around a loss.

18. In any event, it is inequitable to shift, at the appellant's option, both the burden of proof and the risk of loss associated with an appeal onto a third party who has not specifically contracted for that duty (such as surety on a supersedeas

bond). An indemnification or assistance agreement is not *per se* the same as an agreement to insure the cost of a lawsuit. The appellants are not third party beneficiaries of the assistance agreement since they clearly were not intended beneficiaries. *See Taylor Woodrow Blitman Constr. Co. v. Southfield Gardens Co.*, 534 F.Supp. 340 (D.Mass.1982). If a benefit to a given third party is merely incidental, the nonparty to the agreement may not recover on or sue to enforce the agreement. *See Western Waterproofing v. Springfield Housing Auth.*, 669 F.Supp. 901 (C.D.Ill.1987). Where appellants in this case could not enforce the assistance agreement in a separate action, it would be inequitable to allow them to achieve that end by insisting that the agreement serve as a *de facto* bond during the pendency of this appeal.

**604**

1989.[19] Interest is to be paid monthly at the rate of two percentage points over the interest rate payable on six month United States Treasury Bills on the date such interest is first due, and adjusted every six months thereafter.[20] Should the Gleasmans fail to make any interest payment within ten days of the due date in any month, it shall be considered an event of default on the bond.

The court rejects Franklin's contention that a bond equal to the stipulated value of the property is required. The purpose of a bond, after all, is to protect Franklin against any *loss*, not to confer a windfall. The property itself is not going anywhere. If the appeal is decided against the Gleasmans, Franklin will be able to recover the property by foreclosure. The appeal does not endanger that legal right. If there is a default during the appeal, the stay will terminate. The bond indemnifies Franklin against any erosion in the value of its secured claim resulting from a decline in the value of the property from its current stipulated value of $1.5 million during the pendency of this appeal (unless, of course, appellants prevail on the appeal). A bond sufficient to cover any such anticipated loss is all to which Franklin is justly entitled. To recover on the bond, Franklin will have to prove any asserted loss by evidence of an arms-length sale conducted in good faith to a purchaser buying in good faith.

So ORDERED.

---

**19.** This was the day before the date on which Franklin could have foreclosed on the property but for the stay.

**20.** The determination of an interest rate protecting the present value of Franklin's secured claim while a stay pending appeal is in effect is not unlike the determination of an appropriate interest rate to provide a creditor with the present value of its secured claim under a plan of reorganization.

Using the interest rate on riskless U.S. treasury obligations as a baseline and adding a two percent risk premium is sufficient to protect Franklin in this case, given the nature of the property. *See In re Snider Farms, Inc.,* 83 B.R. 977 (Bankr.N.D.Ind.1988).